**Jon Lee CUNNINGHAM, Plaintiff,**

v.

**Robert LIST, et al., Defendants.**

**No. CIV–R–80–274–ECR.**

United States District Court, D. Nevada.

March 24, 1982.

Jon Lee Cunningham, in pro. per.

Richard Bryan, Atty. Gen., Carson City, Nev., for defendants.

MEMORANDUM DECISION

EDWARD C. REED, Jr., District Judge.

This civil rights action has been brought by Jon Lee Cunningham, an inmate at the Nevada State Prison, against officials of the Nevada State Prison because of alleged injuries which arose during a disturbance at the prison on November 5, 1980. This action was brought under 42 U.S.C. § 1983. The jurisdiction of the Court is invoked under 28 U.S.C. § 1343. Upon motion, not opposed by plaintiff, this action was ordered dismissed as to defendants Robert List and Richard Bryan.

On November 5, 1980, the plaintiff was employed as an inmate cook in the culinary department at the prison. Between 10:00 and 10:30 a. m., the body of an inmate, the apparent victim of foul play, was discovered in the prison. According to standard procedures a lockdown of the general population of the prison was ordered by the prison administration. The lockdown order did not apply to inmates working in the culinary department because it was necessary to feed the inmates during the lockdown. The inmate culinary workers observed and heard the disturbance in the cell block. They saw that fires were being started and they heard a great deal of noise.

The fires were started at about 6:00 to 6:30 p. m. Efforts were made to extinguish them and within an hour or so most of them had been put out. But there was still smoke in and about the cell block and some of the fires may have rekindled. At approximately 7:00 p. m. Captain Gary True held a meeting with a select group of inmates for the purpose of passing certain information on to the general population. He explained that the institution had been locked down according to standard procedures and that the lockdown would only be overnight. Normal operations were to be resumed the next day.

The purpose of a lockdown following a homicide is to preserve evidence within the prison which might otherwise be destroyed and to permit interrogation of inmates possibly involved in the occurrence. After the meeting the select group of inmates were permitted to return to their cells to pass the word to the other prisoners about what was going to occur. A little before 8:00 p. m., in accordance with standard procedures, the inmate culinary workers, including plaintiff, were returned to their cells.

There was a lull in the disturbance during the period after Captain True's meeting with the prisoners until sometime after 9:00 p. m. 9:00 p. m. is the normal time for the lockdown of the prisoners at NSP. At about that time plaintiff heard a call for the prisoners to lockdown and at his urging the prisoners in cell block 2A West locked

down. This was done by them going into their cells with the doors being closed behind them. Apparently prisoners in cell blocks 2B East and 2B West did not follow the order to lock down. The prison officials had made a contingency plan that tear gas would be used in the event the prisoners did not lock down at the normal time. This was believed to be the least drastic measure to obtain order in the institution and to quell a disturbance. Alternatives open to the prison officials included the use of armed prison officers to go into the cell blocks or the use of the Carson City SWAT team which had been called. The procedure of the SWAT team was for its armed members to go into the cell blocks and to use whatever force was necessary to restore order.

By 10:30 p. m. order had not been restored and the disturbance continued. A barrage of tear gas was used at approximately that time and the firing of tear gas canisters continued until about 1:00 a. m. Since there was no disturbance in cell block 2A West where plaintiff was housed, no canisters were fired with the intent of affecting those prisoners. Some canisters, however, were fired from the south end of the hallway of 2A West in the direction of 2B West which lay to the north. Several short rounds fell in the vicinity of plaintiff's cell in the tier. Other canisters were fired from a point just north of tier 2A West in a northerly direction into 2B West. The result was that there was a considerable concentration of tear gas in 2A West resulting from the efforts to gas the prisoners in the adjacent cell block, 2B West.

Plaintiff claims that he suffered a burning sensation of the eyes, breathing problems and nausea as a result of the gas. He also claimed that he suffered from a rash as a result of the gas, but at the trial he testified that his doctor told him that the rash was due to nerves. There is no credible evidence that the rash, which has continued up to the present, resulted from the gas.

At the time the inmate culinary workers were returned to cell block 2A West, there was a doubt as to whether the disturbance

had been quelled. Mr. Neuneker testified that while it might have been possible to place the inmate culinary workers in the hospital or in a bull pen in the prison yard, all available security personnel were needed to contain the disturbance and therefore it was not practical to place these workers in one of these areas segregated from the disturbance. It does seem to the Court that where practical prison officials would want to place inmates not involved in a disturbance in an area other than cell blocks where a disturbance is actually occurring. Obviously inmates innocent of participation in a prison riot should not be placed into a cell block where a riot is actually taking place.

If the inmate culinary workers could have been placed elsewhere, the prison officials were ill-advised to return them into a cell block where a riot was taking place, endangering the safety of both the inmates and the prison staff. However, at the time the culinary workers were returned to their cells there was a lull in the riot and prison officials had reason to believe that the culinary workers would be reasonably safe in their cells. Also all available security personnel were needed in the areas where the riot had occurred in order to contain the disturbance. While it may have been preferable to have the inmate culinary workers placed in a different secure area, it is not the job of the Court to second guess rationally based decisions by prison officials made under difficult circumstances, such as these. This is not to say that the Court, if it were acting in the role of superintendent of the prison, might not have done something different. The Court is required to defer to the reasonable actions of prison personnel who are far better suited to supervise the conduct of the prison than the Court.

The case, then, boils down to the question of whether prison officials should be held liable on account of injuries to inmates suffered through not unreasonable actions to quell a prison disturbance, in this case the firing of tear gas. The evidence is clear that no tear gas was intentionally fired into plaintiff's cell block, 2A West. It appears that some short rounds fell in that cell block and that gas fired into the adjacent cell block enveloped the non-offending cell block 2A West. Captain True testified that he and the other prison officials knew that it was unavoidable that some gas would get into 2A West.

Although an intentional, unjustified and unnecessary use of tear gas may give rise to a claim for damages in an appropriate action brought under 42 U.S.C. § 1983, this is not such a case. Other courts, when faced with a situation such as this—that is, use of tear gas in the course of a serious prison disturbance or riot—have uniformly held that no constitutional rights of those affected by tear gas have been violated. *LeBlanc v. Foti*, 487 F.Supp. 272 (E.D.La.1980), *Washington v. Anderson*, 387 F.Supp. 412 (E.D.Okl.1974), *Davis v. United States*, 316 F.Supp. 80 (E.D.Mo.1970) *aff'd.* 439 F.2d 1118 (8th Cir. 1971).

The foregoing memorandum decision shall constitute findings of fact and conclusions of law.

IT IS HEREBY ORDERED that the Clerk of the Court enter judgment in favor of defendants and against plaintiff.